# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | No. 11-261 |
| MIKEL D. JONES | : | |

## MEMORANDUM

**Schiller, J.** September 8, 2011

In a ten-count superseding indictment, Mikel Jones is charged with mail fraud, wire fraud, and money laundering. The Government contends that Jones misused loan proceeds intended to help expand his law firm by utilizing the money for personal use, including buying sports tickets and paying his personal credit card bills. As part of the investigation into these allegations, FBI agents executed a search warrant at Jones's Florida residence on January 19, 2011. On that day, FBI agents also spoke with Jones and wife. Jones claims that he was in custody when he was interrogated, and because he was never informed of his *Miranda* rights, his statements to agents must be suppressed. The Court holds that Jones was not subjected to a custodial interrogation on January 19, 2011, and therefore denies his motion to suppress.

## I. BACKGROUND

On January 19, 2011, federal agents executed a search warrant on the home of Mikel Jones. As to what happened on that day, the parties agree on few details; in addition to the search of his home, agents either had a voluntary discussion with Jones and his wife about the loan Jones received for his law firm or they improperly violated his *Miranda* right when they interrogated him.

FBI agent Richard J. Haag testified for the Government at the suppression hearing. On the

day in question, Agent Haag arrived with Agent John Maser at approximately 7:15 a.m., while Jones was at home with his wife and daughter. Jones's daughter answered the door, and after the agents identified themselves, Jones's daughter informed her father of the agents' presence. When Jones came to the door, the agents identified themselves and asked if they could speak with him about a loan he received from the Philadelphia Commercial Development Corporation. Jones invited them in and the three men went into the living room. At this time, the Jones's home security camera was on and captured the dining and living rooms. Jones asked if the agents would wait to question him until his daughter left the home. The agents honored the request. The video showed Jones's wife in the living room for a period of time before she left the area. Additionally, Jones was seen leaving the living room unescorted on two occasions, once to get his reading glasses.

    The interview of Jones began at approximately 7:45 a.m. Agents talked with Jones for approximately one and one half hours before informing him that they had a search warrant for the premises. When agents informed Jones of the warrant, Jones asked agents if he could speak with his wife, which he did. A few moments later, Jones and his wife asked for privacy so they could pray. The agents agreed. Although the interview began with only Agents Haag and Maser in the home, additional agents – approximately ten in total – came on the scene to conduct the search.

    At some point, agents learned that their encounter with Jones was being videotaped. They instructed Jones to shut off the surveillance camera, purportedly because there were undercover agents in the home. Although Jones was reluctant to turn off the security camera, he complied when agents insisted and informed him that if he did not shut off the camera, an agent would.

    Jones was defensive at various points in the interview, but Agent Haag described the tenor of the questioning as calm until Jones became agitated when Agent Haag told him that they had a

search warrant. Jones asked agents if he was in trouble, to which Agent Haag responded that the search warrant was an investigative tool to prove or to disprove the belief that a crime had been committed. When Jones asked if he should get an attorney, Agent Haag informed him that he could not offer legal advice, but that Jones could get an attorney if he wanted one, and the questioning could be delayed while Jones sought an attorney. Jones did not say that he wanted an attorney or end the questioning. During the search, agents discovered that Jones had some storage units located in Lake Worth, Florida. He gave his consent to agents to search those storage units.

On two occasions, Agent Haag offered Jones the chance to get dressed, but Jones remained in his pajamas throughout the day. Agent Haag was unsure if Jones ate anything during the day, but he testified that Jones was given the opportunity to eat and that Jones offered Agent Haag a drink at some point when they were in the kitchen. Although no agent demanded Jones admit his guilt, Agent Haag told Jones that he could help himself by cooperating with the investigation, perhaps by recording conversations. Jones declined.

At approximately 1 p.m., Mrs. Jones joined her husband in the kitchen for additional questioning, which lasted until agents left the home around 5 p.m. At 4:30 p.m., agents provided Jones and his wife with grand jury subpoenas requiring them to turn over essentially the same documents as those sought in the search.

Jones was never provided his *Miranda* rights at any point in the day, but he believed that he was under arrest.

Jones also took the stand at the suppression hearing and disputed a number of points to which Agent Haag testified. According to Jones, an agent approached him in a threatening manner when Jones objected to shutting off his surveillance camera, forcing Jones to tell the agents to calm down.

Jones also testified that he asked the agents if he and his wife together could discuss the investigation with the agents, but the agents refused. According to Jones, agents refused to allow him to wash up and get dressed. He was also not offered anything to eat. Jones also testified that Agent Maser said to him, "We got you. Why don't you just admit you have problems, just confess." Furthermore, when Jones went to the bathroom, he was accompanied by an agent who made him keep the bathroom door ajar.

## II. STANDARD OF REVIEW

Persons subject to custodial interrogation are entitled to be informed of their right to remain silent, their right to an attorney, and their right to have a lawyer appointed for them if they cannot afford a lawyer. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). Whether questioning by law enforcement officers constitutes a custodial interrogation is decided on a case-by-case basis. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). "An individual is in custody when he or she has been 'deprived of his freedom of action in any significant way.'" *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) (quoting *Miranda*, 384 U.S. at 444). This inquiry necessitates that a court examine the circumstances around the interrogation to decide whether, given those circumstances, a reasonable person would have felt that he or she was not free to terminate the interrogation and leave. *Jacobs*, 431 F.3d at 104-05. A formal arrest is not necessary for a finding of custody, but if no arrest is made "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)).

4

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

If a defendant seeks to suppress a statement under *Miranda*, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

## III. DISCUSSION

Having reviewed the parties' filings, watched the videotape of portions of the questioning, and listened to the testimony of Mikel Jones and Agent Haag, the Court finds that the Government did not violate Jones's *Miranda* rights.

To decide whether a person was in custody, courts consider: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. *Willaman*, 437 F.3d at 359-60. "Additional factors deemed important by the Third Circuit include what information was known by the officer concerning the suspect's culpability and whether the officer revealed his belief that the suspect was guilty." *United States v. Rodriguez*, Crim. A. No. 09-219, 2010 WL 1485704, at *6 (M.D. Pa. Apr. 12, 2010) (citing *Jacobs*, 431 F.3d at 105).

Jones believes a number of factors support his request to suppress his statements to agents. He notes the length of the interrogation, the tenor of the agents' tones throughout the questioning, the agents' refusal to allow him food or drink and permitting him to use the bathroom but only with an escort and open bathroom door, the agents' refusal of his request to talk with his wife during the questioning, and the number of law enforcement officials in his home throughout the day.

### A. Length of Interrogation

The length of the interrogation here weighs in favor of finding that a custodial interrogation occurred. Courts have found interrogations lasting between one and one half hours and seven hours to be non-custodial. *United States v. McKinney*, 695 F. Supp. 2d 182, 191 (E.D. Pa. 2010) (citing cases). The Government argues that although the search of Jones's residence required agents to be in his home for approximately nine and a half hours, "the substantive interview was completed by about 2 p.m." (Gov't Opp'n to Def.'s Mot. to Suppress at 10.) The Court sees no way to parse the "substantive" portions of the interview from the mere chit-chat or time agents spent attending to other matters in the home. Furthermore, the Government has cited no law to support its argument that certain time may be deducted from the length of the interview because agents have already elicited useful information.

### B. Location of Interrogation

The fact that the questioning occurred in Jones's home weighs against finding that this incident was a custodial interrogation. *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) (noting that questioning on one's "own turf . . . softens the hard aspects of police interrogation"); *Rodriguez*, 2010 WL 1485704, at *7 (noting that courts are "more likely to find that a Defendant is not in custody when he is in the comfort of his own home").

## C. Coercive Tactics and Information Conveyed to Jones

The parties agree that agents never told Jones on January 19, 2011, that he was under arrest. Nor does the Court find evidence that agents displayed their weapons, physically restrained his movements, or threatened Jones during their questioning. Jones's belief that agents were at his house to arrest him was subjective, yet the Court did not see evidence or hear testimony to justify that belief. Indeed, Jones's willingness to talk with agents in his home indicates that the authorities were there to investigate, not to apprehend. And, of course, it is the objective circumstances that dictate whether a custodial interrogation occurred, not the views of the individual being questioned. *McKinney*, 695 F. Supp. 2d at 189.

According to Jones, agents questioned him in an aggressive manner and often took a hostile tone. For example, he was ordered to turn off his security camera. He was also forced to remain in his pajamas, not allowed to eat all day, and kept from talking with his wife. Additionally, Jones stated that he felt restrained because agents were always within a few feet of him and could always see his movements. That is not a restraint of movement. Agents were searching his home and talking to him and his wife; it is therefore unsurprising that agents were within view of Jones throughout the day. Additionally, the tape shows Jones on at least two occasions leaving the company of the agents. The evidence does not suggest that Jones was ordered to stay in a particular location or handcuffed or prevented from moving about his home. Moreover, Jones's son and daughter were allowed to enter and exit the home unimpeded.

The Court finds Agent Haag's testimony credible that on two occasions, he offered Jones the opportunity to get dressed. Jones also testified that agents acceded to two requests he made: to wait to begin questioning him until his daughter left the house and to allow Jones and his wife to pray in

7

their living room without agents present in that room. The fact that agents agreed to these two reasonable requests is further evidence that Jones was not restrained in his movements.

Having listened to the testimony, the Court does not believe that Jones was purposely kept from his talking with his wife. As noted earlier, Jones and his wife were permitted to pray together, outside the presence of agents. Additionally, there was testimony that Jones and his wife answered questions from 1 p.m. until the conclusion of the interview several hours later.

The Court is not suggesting, as the Government hints at, that Jones was not in custody because he never asked if he was arrested or was free to leave, or that Jones was not in custody because he would have been permitted to speak with his wife if only he had asked. Jones was in his home with his wife; a reasonable person should not be required to leave his or her home before a court finds an interrogation custodial. Nor is the onus entirely on the suspect to demand his or her rights. *See United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.") *Miranda* would be hollow if a custodial interrogation only took place when the suspect first asked for a lawyer or sought to terminate the questioning. There is no need to warn somebody of rights he or she has already asserted. Law enforcement officers must be vigilant of the persons and situations they encounter when they investigate crimes. If a reasonable person would not feel free to end the examination, officers are not absolved of their responsibilities under *Miranda* because the suspect never asked if he was arrested or failed to voice objections to continued questioning.

### D. Voluntariness of Jones's Statements

Two points are salient on the issue of the voluntariness of Jones's statements. First, Agent Haag testified that Jones spoke willingly throughout the course of the investigation and was never under any compulsion to continue the conversation. Jones, on the other hand, discussed his subjective belief that he felt compelled to maintain the discussion. The videotape does not depict Jones as a man who appears fearful of speaking with agents. The length of time with which Jones spoke with agents further indicates that he spoke voluntarily, as does his refusal to aid in the investigation against him by recording conversations.

Second, Jones testified that he knew that he could end the agents' questioning, and he knew that he had the right to call a lawyer. This knowledge is relevant to the voluntariness of his statements to law enforcement. The Government, however, makes too much of Jones's status as a lawyer when it contends that because Jones is a civil rights attorney with particular expertise in Fourth Amendment issues, he should know when he is in custody under *Miranda*. (Gov't Opp'n to Mot. to Suppress at 5-6.) Jones disputed his expertise in the area and noted the stress and strain caused by having agents enter his home and question him and his wife. Some courts, when performing a *Miranda* analysis, have considered whether the person questioned is a lawyer. *See United States v. Wilson*, 901 F. Supp. 172, 175 n.3 (S.D.N.Y. 1995) (using reasonable lawyer standard to determine if custodial interrogation occurred); *United States v. Zolp*, 659 F. Supp. 692, 721 (D.N.J. 1987) ("It is not unreasonable to assume a criminal defense attorney understands and is aware of the consequences of a consent to an F.B.I. agent's request for permission to search his briefcase."); *but see United States v. Farinacci-Garcia*, 551 F. Supp. 465, 476 (D.P.R. 1982) ("The government's contention that, because [the defendant] is a lawyer who is necessarily cognizant of

9

his rights, the absence of *Miranda* warnings prior to custodial interrogation may somehow be excused has no support in constitutional case law. No consideration relevant to the constitutional protection against self-incrimination suggests any deviation based on distinct groups or classes of individuals who have knowledge of the law. The protection exists for all.").

While Jones's profession is relevant to whether he spoke voluntarily, his job is not the basis for the Court's holding. The punishment for earning a law degree is not a diminished right to *Miranda* warnings. When a knock on the door reveals federal agents armed with a search warrant, even a lawyer is bound to display concern. Thus, the only weight this Court attaches to Jones's job as an attorney is that his knowledge of his rights suggests he spoke to agents voluntarily.

### E. Additional Factors

The Court finds that the cadre of law enforcement officials in his home, though coercive in nature, does not render their interaction with Jones a custodial interrogation. Only two agents first arrived on the scene, and though a number of agents aided in the search of the home, the questioning of Jones was conducted by a smaller number of agents, with the bulk of the agents in the home only to search the premises. It is commonplace for numerous agents to be present to execute a search warrant. *See United States v. Kofsky*, Crim. A. No. 06-392, 2007 WL 2480971, at *27 (E.D. Pa. Aug. 28, 2007). Finally, agents had knowledge of Jones's possible criminal activity, which weighs in favor of finding a custodial interrogation. *See Jacobs*, 431 F.3d at 105 (noting that officer with cause to believe suspect committed crime will be more likely to create atmosphere of significant restraint). Similarly, asking a suspect to aid in an investigation by recording future conversations is characteristic of a custodial interrogation. Nonetheless, the totality of the circumstances leads this Court to conclude that no custodial interrogation occurred.

## IV. CONCLUSION

The wiser course of action for agents who spend an entire day searching a suspect's home and talking with him and his wife is to read the suspect his *Miranda* rights. However, because the questioning took place in Jones's home, with no display of force or coercion, and because Jones talked voluntarily, the Court will not suppress his statements. An Order consistent with this Memorandum will be docketed separately.